UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
         v.                         )      Criminal Action
                                    )      No. 15-10347-PBS
VINCENT ANZALONE,                   )
                                    )
              Defendant.            )
_____)

**MEMORANDUM AND ORDER**

October 28, 2016

Saris, C.J.

**INTRODUCTION**

Defendant Vincent Anzalone is charged with one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and one count of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A).

The defendant has moved to dismiss the indictment on the basis that the government acted outrageously in maintaining the child pornography website Playpen for two weeks during an FBI investigation. After an evidentiary hearing, the defendant's motion to dismiss (Docket No. 52) is **DENIED**.

**FACTUAL BACKGROUND**

The Court described the facts of this case in its order denying the defendant's motion to suppress. United States v.

Anzalone, No. CR 15-10347-PBS, 2016 WL 5339723, at *1-5 (D. Mass. Sept. 22, 2016). The Court assumes familiarity with that opinion.

The Court held an evidentiary hearing on this motion on October 14, 2016, in which FBI Special Agent Daniel Alfin testified credibly. The Court relies on the evidence at that hearing as well as the affidavits of FBI Special Agents Douglas Macfarlane and Daniel Alfin and the government's response to a discovery order in a similar case in another district, which was submitted by the defense. See Docket No. 48, Ex. 2; Docket No. 83, Ex. 1; Docket No. 78, Ex. 1.

Playpen was a website dedicated largely to child pornography. Playpen's administrator sought to limit access to the site to those using the Tor network. In his affidavit, Special Agent Macfarlane described the mechanics of the Tor network. The Tor network, also known as The Onion Router, is an anonymity network that masks a user's IP address. To access the Tor network, a user must download an add-on to the user's existing browser or download the Tor browser bundle. To ensure anonymity for its users, the Tor network bounces communications through various relay computers. When a user accesses a website, the IP address of the last computer in that chain is displayed, rather than the user's IP address. The network therefore "prevents someone attempting to monitor an Internet connection

from learning what sites a user visits, prevents the sites the user visits from learning the user's physical location, and it lets the user access sites which could otherwise be blocked." Macfarlane Aff. ¶ 8, Docket No. 48, Ex. 2.

Within the Tor network, sites can be designed as "hidden services." Hidden services allow websites and other servers to hide their location. Like traditional websites, these sites "are hosted on computer servers that communicate through IP addresses." Id. ¶ 9. Unlike such websites, however, the "IP address for the web server is hidden and instead is replaced with a Tor-based web address, which is a series of algorithm-generated characters" followed by the suffix ".onion." Id.

Due to a misconfiguration of the server hosting Playpen, the server's IP address was made publicly available. This glitch offered the FBI a rare opportunity to locate the server, find the administrator, and identify the site's users. When the FBI learned of the server's IP address, it secured a search warrant for the server. It executed that search warrant in mid-January 2015 at CetriLogic, a server hosting company located in North Carolina. The FBI obtained a copy of the Playpen site at that time.

A few weeks later, on February 19, 2015, the FBI arrested Steven Chase -- Playpen's principal administrator -- and assumed control of Playpen, moving a copy of the site to a government

server in the Eastern District of Virginia. From that location, the government operated the website for two weeks, from February 20 to March 4, 2015, in order to identify the IP addresses of Playpen users. After procuring a warrant, the government deployed a Network Investigative Technique (NIT) on users' computers that caused those computers to transmit their IP address and other pieces of identifying information back to the government. The FBI paired users' IP addresses with the content they accessed on the site. The government then sought additional warrants to search users' homes for child pornography.

Most of Playpen's content was not hosted directly on the Playpen site; instead, Playpen operated primarily as a bulletin board on which users posted links to other websites from which child pornography could be downloaded along with the passwords needed to download and decrypt the illegal files. Users would generally post "preview" images as well.

During the two-week period that the government operated Playpen, these links remained mostly accessible to the site's visitors. Users clicked on 67,000 unique links on the website during these two weeks. Of the 67,000 links, approximately 25,000 were links to particular image files and the majority of the images depicted child pornography. The remaining links were to encrypted archives containing multiple image or video files. During the government's operation of the site, users posted

4

13,000 new links. Users had posted approximately 110,000 links over the entire lifespan of the site prior to the government's takeover.

The government catalogued many of the images and videos that were made available via these links. Accessing these files required an agent to click on a link, download the files, and then enter the provided password to view them. The government accessed and documented approximately 48,000 images and 200 videos that were posted sometime between the launch of the site and the government takeover. The government documented another 9,000 images and 200 videos made available during the two-week period that the government ran the site. These images and videos contained mostly child pornography.

At no point during this two-week window did the FBI post new images, videos, or links to child pornography. Nor did the FBI enhance the site, either in its content or functionality, beyond what predated the government takeover.

The government did restore the site's file hosting feature, which was briefly down at the time the FBI seized the site and had existed prior to the government's seizure. Upon takeover, the government disabled a section of the site called the Producer's Pen. The Producer's Pen encouraged members to produce and share new child pornography. An undercover FBI agent, posing as the site's administrator, posted a message stating that this

section would be revived in the near future. The agent wrote the message to prevent users from suspecting the government investigation. The Producer's Pen section never actually reappeared on the site.

The FBI reviewed all site postings, including chat and private messages, to assess and mitigate any potential harm to children. When the FBI special agents monitoring the site perceived an imminent harm, they forwarded available identifying information to the relevant FBI office. As of the evidentiary hearing in October 2016, about forty-nine children had been identified or rescued from hands-on abuse as a result of the investigation.

The defendant asserts that the number of visitors to Playpen increased significantly during the two weeks the government ran the site. No such increase occurred. According to Special Agent Macfarlane's affidavit accompanying the NIT search warrant application, the site averaged 11,000 unique visitors per week. During the nearly two weeks that the government operated Playpen, an average of 50,000 unique visitors logged into the site per week. The defendant points to this five-fold uptick and argues that the government must have driven additional traffic to the site. Special Agent Alfin offered an alternative explanation: while an average of 11,000 users per week visited Playpen between August 2014 and February 2015, in

the weeks immediately preceding the government's seizure of Playpen in February 2015, the weekly average had grown much higher. That is because fewer visitors logged in to the site at its launch. As others learned of the site, the number of visitors climbed. By the time the government seized control of the site and began operating it, average weekly visitors already numbered nearly 50,000: between January 31 and February 14, 2015, more than 49,000 unique users logged into the site per week. That figure aligns with the 50,000 average weekly visitors to the site during the two-week period beginning February 20, 2015. The Court concludes that the number of visitors did not appreciably increase when the government began operating the site.

The government held regular meetings to assess whether to continue to operate Playpen. On March 4, 2015, after running the site for two weeks, the government shut it down.

## DISCUSSION

The defendant argues that the government acted outrageously, and in violation of the Due Process Clause of the Fifth Amendment, in operating Playpen for two weeks. The defendant asserts that the government did too little to limit dissemination of the site's illegal content during that period while simultaneously attracting additional visitors to the site. The government responds that maintaining the site for two weeks

7

was necessary to identify the site's users and that the number of visitors to the site remained stable after the government began operating the site.

"In limited circumstances, courts may dismiss criminal charges in response to outrageous government misconduct." United States v. Djokich, 693 F.3d 37, 43 (1st Cir. 2012). "But the law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence, and, accordingly, the power to dismiss charges based solely on government misconduct must be used sparingly." United States v. Guzman, 282 F.3d 56, 59 (1st Cir. 2002). "[T]he outrageous government misconduct doctrine is reserved for the most appalling and egregious situations." Id.; see also United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007) ("While the doctrine is often invoked by criminal defendants, it has never yet been successful in this circuit."); United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) ("[T]he doctrine is moribund; in practice, courts have rejected its application with almost monotonous regularity."); United States v. Allain, No. 15-CR-10251, 2016 WL 5660452, at *13 (D. Mass. Sept. 29, 2016) ("Reasonable minds will no doubt differ on whether the government made the right choice here, but it is not the rare case in which any misconduct on the part of the government was sufficiently blatant, outrageous, or egregious to warrant the dismissal of the indictment.").

"Dismissal may be proper, however, where the government's misconduct is 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" Djokich, 693 F.3d at 43–44 (quoting United States v. Russell, 411 U.S. 423, 431–32 (1973)). "The Supreme Court has not foreclosed the possibility that the government's active participation in a criminal venture may be of so shocking a nature as to violate a defendant's right to due process, notwithstanding the defendant's predisposition to commit the crime." United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. 1990); see also Santana, 6 F.3d at 4-5.

"[F]undamental fairness is not compromised in a child pornography case merely because the government supplies the contraband." United States v. Gifford, 17 F.3d 462, 471 (1st Cir. 1994). In Gifford, law enforcement performed a sting operation in which undercover postal inspectors sent multiple letters to the defendant asking if he was interested in purchasing child pornography. After the defendant expressed interest, the government shipped illegal tapes to the defendant's home and made an arrest. The defendant asserted that the government's conduct was outrageous. The district court rejected the defendant's claim and the First Circuit affirmed. The First Circuit concluded that it could not say "the postal inspectors lacked a rational basis for mounting a long-running

9

series of undercover operations in an effort to curb unlawful trafficking in child pornography." Id.

The defendant emphasizes various aspects of the investigation that he says demonstrate that the government acted outrageously.

First, the defendant contends that the FBI did not block access to the site's illicit content despite having the technical means of doing so. The government responds that the benefits in maintaining the site outweighed the costs. In any case, the government says, its decision to continue operating the site was not outrageous. The Court agrees. The FBI maintained access to the site's content because it predicted that significant changes to the site would tip off Playpen's users, making it more difficult to find and arrest them. The FBI convened regularly to assess the continued benefits of the investigation. When it concluded that the costs outweighed the benefits of keeping the site online, the FBI shut the site down. The FBI also continuously monitored postings to the site and took immediate action where it determined that a child was in imminent danger. Continued operation of the site saved children from dangerous home environments: as of October 2016, at least forty-nine children have been identified or rescued from abuse. This is not emblematic of outrageous government conduct.

Second, the defendant asserts that the FBI made no attempt to control or recover Playpen's images and videos. The Court has received evidence to the contrary: the government "expended significant efforts to document and capture as many of the images/videos posted in this fashion by site users as practicable." Docket No. 78, Ex. 1 at 2. According to the government, FBI agents catalogued approximately 48,000 images and 200 videos that were posted before the government began operating Playpen, as well as 9,000 images and another 200 videos accessible on the site during the period the government ran the site. Most of these images and videos depicted child pornography. Once catalogued, these files can be compared with databases of known child pornography to help identify victims.

Third, the defendant contends that during the two-week period that the government operated Playpen, the site experienced a significant increase in traffic. The Court finds that approximately the same number of users visited the site in the weeks before the government takeover as visited it in the two subsequent weeks. Between August 2014 and February 2015, an average of 11,000 unique visitors logged into Playpen each week. The government explains that fewer users logged in during the nascent stages of the site's existence, dragging down this seven-month average. However, in the first two weeks of February -- just prior to the two weeks that the government controlled

11

the site -- an average of more than 49,000 visitors logged in per week. This figure mirrors the 50,000 visitors who entered the site per week during the two-week period in question.

The government acknowledges that an undercover FBI agent posing as the site's administrator did post to the site's message boards announcing that the Producer's Pen section would be restored shortly. This was a decoy to convey continuity to Playpen's users. It is troubling that an agent stated that the Producer's Pen would be returning in the future because that section might have encouraged members to produce and share new child pornography (although there is no evidence it did so). Significantly, however, the FBI never actually brought this feature back online. Furthermore, these posts could be read only by those who were already logged into Playpen; they were not accessible more broadly and were not specifically designed to attract new users to the site. Finally, the government did not take any action to improve upload and download speeds or otherwise enhance the site's functionality.

The government's conduct here -- operating Playpen for two weeks and permitting continued access to links to child pornography -- did not violate the Fifth Amendment. The FBI did seek to surreptitiously ensnare Playpen users by keeping the site active and leaving its contents unchanged, but "undercover operations by their nature involve elements of furtiveness,

12

duplicity, and manipulation". Gifford, 17 F.3d at 470. The First Circuit has "never held that such initiatives are per se unfair." Id. This Court finds the investigation here did not cross the line into outrageous conduct worthy of dismissal. See Luisi, 482 F.3d at 59 ("After considering the totality of the circumstances in this case, we think the government's actions fell well short of shocking the 'universal sense of justice.'").

## ORDER

The defendant's motion to dismiss (Docket No. 52) is **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge